No. 46,409

CAPITOL CABLE, INC., *Appellee*, v. CITY OF TOPEKA, KANSAS, a Municipal Corporation; GENE C. MARTIN, Mayor; KENNETH KERN, JIM LOVE, LAUREN NASH and CHARLES CAMPBELL, constituting the Board of City Commisioners, Topeka, Kansas, *Appellants*.

(495 P. 2d 885)

Opinion filed April 8, 1972.

*Robert A. McClure,* of Colmery, McClure, Funk and Hannah, of Topeka, argued the cause, and *Gerald J. Letourneau,* of the same firm, and *Dan E. Turner,* City Attorney, were with him on the brief for the appellants.

*Leland Spurgeon,* of Hiatt and Spurgeon, Chartered, of Topeka, argued the cause, and *Eugene W. Hiatt* and *Kenneth F. Crockett,* of the same firm, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a declaratory judgment action to determine the validity of a CATV enabling ordinance known as the "Topeka Cable Television Systems Franchise Ordinance," and a franchising ordinance issued pursuant thereto under the Home Rule Amendment of the Kansas Constitution.

The action was originally commenced by Capitol Cable, Inc. (plaintiff-appellee) for mandamus and damages. After pretrial and before the case was ultimately submitted to the trial court, it was converted to a declaratory judgment action challenging the validity of the enabling cable television ordinance. (See K. S. A. 60-1701.)

The trial court rendered its decision in this action upon due con-

sideration of appellants' motion for summary judgment. (K. S. A. 60-256.) It concluded the "Topeka Cable Television Systems Franchise Ordinance" (ordinance No. 12959) was void and unenforceable. As a consequence ordinance No. 12986 granting a franchise to Cablecom-General of Topeka pursuant to the enabling ordinance was declared invalid.

The material facts are not in dispute.

Ordinance No. 12959 of the City of Topeka known as the "Topeka Cable Television Systems Franchise Ordinance" was enacted on July 7, 1970. It provides, in essence, for the issuance of a non-exclusive franchise or permit for cable television systems by the governing body of the City of Topeka. It provides that an award of franchise is to be made on the basis of applications. In connection with the ordinance instructions were prepared and distributed to those wishing to make application for a franchise. The details required in the application are similar to those specified in the ordinance and need not be set forth.

Pursuant to the provisions of ordinance No. 12959, nine applicants made application for a franchise. All nine were certified to the City Commission by the City Clerk, and on August 4, 1970, the applicants were given an opportunity to present their applications orally. On August 5, 1970, the City Commission awarded a franchise to Cablecom-General of Topeka, one of the nine applicants. The other eight, including Capitol Cable, Inc., the plaintiff herein, were denied franchises. As a result the plaintiff brought this action originally as a mandamus action to compel the City of Topeka to issue a franchise to it under the ordinance. In essence, the plaintiff's original petition admitted the validity of ordinance No. 12959, but subsequent developments, prior to submission of the case, raised an issue concerning the constitutional validity of the ordinance.

Thereafter ordinance No. 12986 granting Cablecom-General of Topeka a franchise was enacted on August 25, 1970. It authorized Cablecom-General to construct, operate and maintain a community antenna television system within the City of Topeka. As a result of the plaintiff's action herein the City was enjoined from publishing the ordinance until final determination of the litigation.

Provisions of the enabling ordinance (No. 12959) are summarized as follows:

Among the definitions at the beginning of the ordinance it defines "CATV System" and "Franchise" as follows:

" 'CATV SYSTEM' means a system composed of, without limitation, antennae, cables, wires, lines, wave guides or other conductors, equipment, or facilities, designed, constructed or used for the purpose of receiving, amplifying and distributing by coaxial cable audio-visual, television, electronic, electrical, or radio signals to persons in the City for a fee.

" 'FRANCHISE' means the non-exclusive authorization granted hereunder to use the streets and alleys of the City to construct, operate, maintain or lease a CATV system and provide CATV service within the corporate limits of the City."

It then provides:

(a) No person shall use the streets or other public ways of the City to install or operate a CATV system, or provide CATV service in the City without a franchise.

(b) A franchise is to be granted on the basis of the applications made to the City in writing to be accompanied by a $250 nonrefundable application fee. The application should contain the following information:

(1) The name, address and form of business organization.

(2) A description of the CATV system proposed to be installed or operated; the proposed location of components of such CATV system, the manner in which the applicant proposes to install or operate the same; the extent to which existing or future poles or other facilities of public utilities will be used for such system; the personnel and qualifications of the working organization proposed for the City; a map specifically showing and delineating the proposed service area within which the applicant proposes to provide CATV service.

(3) A copy of each agreement the applicant has with any other person or firms relating to the proposed franchise, including public utilities.

(4) A copy of the CATV service agreement proposed for use by the applicant with its subscribers.

(5) A statement describing the applicant, its officers and 'directors, partners or major stockholders, indicating business experience, including experience and performance in the CATV system and service field showing any interest in other franchise, the dates of such; a separate listing showing all city employees or officers or appointees that have any interest, direct or indirect, in the applicant; and the application filed with the City shall be accompanied by a bid bond acceptable to the City for $10,000, to be returned if applicant is not awarded a franchise.

(6) A detailed statement showing the estimated cost of the system which applicant proposes to install, the amount of working capital necessary to operate the system during the first five-year period of the franchise. A projection of revenue and expenses for the first five years' operation is to be included.

(7) A declaration that the application is true and complete and that no person not shown in the application has any interest in the application for franchise.

(8) A statement setting forth those signals which the applicant would bring into the City, and in addition thereto, information regarding programming, setting forth the channels to be used.

(9) A statement or schedule of proposed rates and charges to subscribers for installation and services.

(10) A financial statement prepared by a certified public accountant within the last 180 days showing applicant's financial status and his financial ability to complete the construction and installation of the proposed CATV system.

(11) The City Attorney shall prepare instructions and furnish them to all interested parties stating how the application shall be submitted.

"(12) The applicant may submit any information they deem appropriate whether required herein or not."

(c) The Commission will then award a franchise, or franchises, on the basis of the applications, to use the public streets.

(d) The franchise confers on the grantee for twenty years from its effective date, or until terminated, the nonexclusive right to install and operate a CATV system in the City, and for those purposes, to install in, on, over, under, upon, across and along any street any part of the CATV system of the grantee which may be necessary or desirable for operation of the CATV system.

(e) Grantee shall begin installation of the CATV system within a reasonable length of time after the effective date of the franchise ordinance.

(f) Whenever public utility facilities are underground the CATV system, when subsequently installed in the area, shall be installed underground; the CATV system shall only be installed on property of the grantee, on existing pole facilities covered by utility approval, on property of a subscriber, or on utility easements, rights of way, or streets of the City; installation of new poles in the street is forbidden without the prior written consent of the City; the installation of the CATV system shall be in accordance with the requirements of the National Electrical Safety Code of the American Insurance Association and all local and state laws and regulations; the grantee shall at its own expense relocate or change any of its property located on the public streets, rights of way and easements when required to do so by the Commission.

(g) Grantee shall maintain an office staffed to provide adequate service during all usual business hours, and have a listed telephone so that messages, complaints and requests for repairs or adjustments may be received at any time without toll charges.

(h) The grantee shall pay all damages which the City is required to pay as a result of granting a franchise, and shall maintain in effect during the term of the franchise insurance as specified. It shall also provide a corporate surety bond in the sum of $200,000 conditioned upon the faithful performance of the grantee under the ordinance and the franchise. The grantee shall maintain statutory workmen's compensation insurance, including $100,000 coverage for employer's liability coverage.

(i) The grantee is required to file a schedule of fees and charges it will make upon subscribers with the City Clerk upon issuance of the franchise.

(j) The grantee shall pay to the City, in lieu of all occupation and license taxes, charges or fees other than ad valorem taxes which might be imposed by the City, $25,000 for the first year upon the granting of the franchise; beginning the first year after the franchise is granted the grantee shall pay quarterly an amount equal to twenty cents per month, per main installation within the City

for the period; and the City shall have the unqualified right at any time to inspect the grantee's records from which payments to the City are computed.

( *k* ) The grantee cannot transfer, sell, lease, assign or dispose of the franchise without prior consent of the City Commission, which will not be unreasonably withheld.

( *l* ) Any franchise granted under the ordinance shall be nonexclusive.

(*m*) The grantee may renew the franchise for an additional twenty-year term, subject to the provisions of the ordinance, except that the City expressly reserves the right to raise or lower the rate of payment to the City and make other changes it deems advisable.

( *n* ) The City may amend any provision of the ordinance and may adopt regulations it finds necessary in the exercise of the police power, but such amendments and regulations shall be reasonable and not in conflict with the rights granted or with *Federal* or State legislation and regulations; franchises may be terminated prior to their expiration if the Commission finds, after thirty days' notice to the grantee and a public hearing regarding the proposed termination, if the grantee violates provisions of the franchise or ordinance, or if the grantee has been adjudicated a bankrupt, insolvent, or has made an assignment for the benefit of creditors.

( *o* ) The City may require the grantee to permit a public utility serving the City to use some of the component parts of the CATV system as the Commission shall determine to be just and reasonable, when that use would enhance the public convenience, if agreement cannot be reached between the grantee and the public utility; the City may inspect the books, records, maps, plans and other like materials of the grantee for the purpose of determining the grantee's compliance with the orders; the City is authorized to settle disputes arising from the grantee's operations except those to which the City is a party; the City Attorney is authorized to settle disputes arising from the grantee's operations under a franchise or this ordinance, except those to which the City is a party. Appeal may be taken to the City Commission.

( *p* ) Copies of all petitions, applications and communications submitted by the grantee to the *Federal Communications Commission,* Securities and Exchange Commission, Corporation Commission, or any other Federal or State regulatory commission or agency having jurisdiction in respect to any matters affecting CATV system and franchise shall also be submitted simultaneously to the City.

( *q* ) The installation, construction, operation and maintenance of the CATV system and the conduct of its business shall comply with all current *Federal,* State and City laws, regulations and ordinances applicable thereto. *Anything in this ordinance which is in conflict with or contrary to a rule or regulation of the Federal Communications Commission is of no force and effect during the period the rule or regulation of the FCC is in force and effect.*

On the basis of a record presenting the foregoing facts the trial court found there was no showing the City intended to regulate CATV business as a public utility, and the court specifically found "that this business is a private commercial enterprise."

Accordingly the trial court concluded that a municipality cannot,

under the guise of police power, enact an ordinance which would regulate the business of a private commercial enterprise, unless the provisions or regulations are reasonably designed to accomplish the purpose and have a rational relationship thereto; and that the ordinance had no rational relationship to the use and regulation of the city streets, and the Home Rule Amendment under Article 12, Section 5, of the Kansas Constitution does not grant powers to the City of Topeka to enact unreasonable ordinances. It further concluded:

"5. An ordinance which puts it in the power of the officers of a city to grant one and deny others the right to operate a commercial business is invalid and void."

It is apparent the trial court was relying on *Community Antenna TV of Wichita, Inc. v. City of Wichita,* 205 Kan. 537, 471 P. 2d 360, 41 A. L. R. 3d 374. Some of the trial court's conclusions are taken directly from the syllabus in that case.

It cannot be overemphasized that the *Wichita* case was premised upon the trial court's conclusion that community antenna television service " 'is a commercial enterprise of nonpublic utility character.' " (p. 540.) After quoting the trial court's conclusion in the opinion the court said:

"Both parties have accepted and adopted the conclusion. *We therefore accept the statement as conclusive in this particular case without consideration or determination of the question.*" (p. 541.) (Emphasis added.)

In the instant case the conclusion of the trial court that the CATV business is a private commercial enterprise is *not* accepted by the appellants. This must be noted as a major point of distinction.

Senate Bill No. 499 entitled "AN ACT authorizing cities to grant franchises to those engaged in operating or providing cable television service within cities" was enacted by the 1972 session of the legislature and signed by the Governor on March 17, 1972. The act becomes effective and will be in force from and after its publication in the official state paper. Section 1 provides:

"*[C]able television service regulation.* The furnishing of cable television service by means of facilities in place in the public ways, streets and alleys is hereby declared to be *a private business affected with such a public interest by reason of its use of the public ways, alleys and streets so as to require that it be reasonably regulated by cities.* Every city is hereby authorized and empowered by ordinance to permit or prohibit the operation of all businesses furnishing cable television service within its corporate limits. Each city shall supervise and regulate all cable television service businesses operating within

its corporate limits so far as may be necessary to prevent such operation and service from having detrimental consequences to the public interest, and for this purpose may promulgate and enforce such reasonable rules and regulations as it may deem necessary with reference to commencement of operation, territory of operation, the extension of service equitably to all parts of the franchise area, abandonment of facilities, elimination of unjust discrimination among subscribers, financial responsibility, insurance covering personal injury and property damage, safety of equipment, use of streets, alleys, dedicated easements and other public places, and reasonable grounds for forfeiture of franchise rights." (Emphasis added.)

This enactment by the legislature supersedes *Community Antenna TV of Wichita, Inc. v. City of Wichita,* supra, when the act declares CATV to be a private business affected with such a public interest as to require reasonable regulation, contrary to the premise upon which the *Wichita* opinion was written.

While the enabling ordinance here under consideration is similar to the enabling ordinance enacted by the City of Wichita, it cannot be overemphasized that there is another important area of distinction. The Wichita ordinance required the payment of a percentage of the gross income as a franchise privilege. It also required free CATV service to all hospitals, public and parochial schools located within the City, and to municipal buildings. These requirements were held to be unreasonable and void because neither of the above two provisions (the payment of a percentage of gross income and the requirement for free service) bore a " 'reasonable relationship to expense and inconvenience to be occasioned by the city.' " (p. 540.) In the *Wichita* case the court concluded:

"Although many provisions of the ordinance are proper as regulation of the streets, they are so commingled with the unlawful exactions that they are not severable and the entire ordinance must fall." (p. 544.)

On the record here presented we cannot say the annual fee imposed upon the grantee of a franchise by ordinance No. 12959 is unreasonable or excessive in relation to the expense and inconvenience to be occasioned by the City.

The appellants frankly concede they have not relied upon K. S. A. 12-2001 as authority for the enactment of ordinance No. 12959. That statute has been held to apply only to public utilities. (*Manor Baking Co. v. City of Topeka,* 170 Kan. 292, 225 P. 2d 89.)

Since July 1, 1961, under Article 12, Section 5, of the Kansas Constitution, the cities of Kansas have had Home Rule powers. Under Home Rule authority the cities are "empowered to deter-

mine their local affairs and government," and the cities "shall exercise such determination by ordinance," subject only to state statutes of statewide concern applicable uniformly to all cities. (Art. 12, § 5 [b], Kansas Constitution.) The Constitution also provides that the powers and authority granted to cities under the Home Rule Amendment "shall be liberally construed for the purpose of giving to cities the largest measure of self-government." (Art. 12, § 5 [d], Kansas Constitution.)

Prior to the Home Rule Amendment G. S. 1949, 13-434, pertaining to franchises, authorized a city "To grant to any person or corporation the use of the streets, alleys or public grounds" for certain purposes "or other use" to furnish or supply "such city and its inhabitants" with "service" under "such restrictions as shall protect public and private property," provided that no such privilege last longer than "twenty years." After the adoption of the Home Rule Amendment to the Constitution, this and many other statutes affecting cities were repealed in 1963.

Inferentially, *Community Antenna TV of Wichita, Inc. v. City of Wichita,* supra, may be construed to uphold the power of a city to regulate a CATV business under the police power if the ordinance enacted was not unreasonable. Syllabus ¶ 1 reads:

"The home rule amendment in broadening the powers of municipalities did not extend to them the power to enact unreasonable ordinances under the guise of police power."

Counsel for the appellee in the instant case addressed the trial court with reference to the CATV business and said:

"If it is a utility, then I would have to say the City in my opinion probably has the right [to regulate]. If it is private enterprise, I say no. And this becomes the peanut of the case. . . ."

Some courts have classified CATV companies as "public utilities" in the broad sense of that term (*Staminski v. Romeo,* 62 Misc. 2d 1051, 310 N. Y. S. 2d 169; and *Aberdeen Cable TV v. Aberdeen & S. D. TV,* 85 S. D. 57, 176 N. W. 2d 738), or as a public utility in a limited sense impressed with a public interest (*State Ex Rel. Pruzan v. Redman,* 60 Wash. 2d 521, 374 P. 2d 1002). Some say the business is monopolistic in character and affected with a public interest (*TV Pix, Inc. v. Taylor,* 304 F. Supp. 459 [Nev. 1968]), but others say a CATV company is not a natural monopoly and not sufficiently affected with a public interest (*Greater Fremont, Inc. v. City of Fremont,* 302 F. Supp. 652 [N. D. Ohio, 1968].)

In view of the record and recent developments in the CATV busi-

ness, we think the nature of a CATV business is to be resolved, not as a question of fact, but as a question of law. Accordingly, we conclude CATV is a private business affected with such a public interest as to require reasonable regulation by the City. This determination is based not only on the record, but in part on the action of the state legislature in 1972 in adopting Senate Bill No. 499, upon regulations adopted by the Federal Communciations Commission effective March 31, 1972, and proceedings conducted by the FCC prior thereto as reported in the Federal Register (Feb. 12, 1972, Vol. 37, No. 30), hereinafter discussed.

An objective of the Home Rule Amendment to the Kansas Constitution was to give each municipality authority to carry out municipal functions without statutory authorization. Accordingly, the City of Topeka had authority to enact ordinance No. 12959 providing for the issuance of a nonexclusive franchise or permit for cable television systems in accordance with the provisions set forth in the ordinance. On the basis of our review of the ordinance and the record on appeal we find nothing in ordinance No. 12959 which is unreasonable.

Under such ordinance the governing body of the City has discretion, and it is under no positive duty to grant a franchise; hence, mandamus asserted by the appellee to compel the granting of a franchise to it will not lie. (*Cablevision v. Winston-Salem*, 3 N. C. App. 252, 164 S. E. 2d 737.)

The power of the governing body of a city to grant or refuse to grant a franchise is essentially legislative in nature requiring the exercise of judgment and discretion, and courts may not inquire into motives which prompt a municipality's legislative body to enact an ordinance which is valid on its face. (*City of Emporia v. Railway Co.*, 88 Kan. 611, 129 Pac. 161; *Desser v. City of Wichita*, 96 Kan. 820, 153 Pac. 1194; *Decker v. City of Wichita*, 109 Kan. 796, 202 Pac. 89; *City of Emporia v. Humphrey*, 132 Kan. 682, 297 Pac. 712; and *Peoples Taxicab Co. v. City of Wichita*, 140 Kan. 129, 34 P. 2d 545.)

The Federal Communications Commission published the report of its inquiry into cable television service and cable television relay service in the Federal Register, supra, under Title 47—Telecommunication, page 3252. The inquiry was conducted into the development of Communications Technology and Services to formulate

regulatory policy and rule making and/or legislative proposals. Concerning the communications regulatory program it said:

"177. *Dual jurisdiction.* The comments advance persuasive arguments against Federal licensing. We agree that conventional licensing would place an unmanageable burden on the Commission. Moreover, local governments are inescapably involved in the process because cable makes use of streets and ways and because local authorities are able to bring a special expertness to such matters, for example, as how best to parcel large urban areas into cable districts. Local authorities are also in better position to follow up on service complaints. *Under the circumstances, a deliberately structured dualism is indicated; the industry seems uniquely suited to this kind of creative federalism.* We are also persuaded that because of the limited resources of States and municipalities *and our own obligation to insure an efficient communications service with adequate facilities at reasonable charges, we must set at least minimum standards for franchises issued by local authorities. These standards relate to such matters as the franchise selection process, construction deadlines, duration of the franchise, rates, and rate changes, the handling of service complaints, and the reasonableness of franchise fees. The standards will be administered in the certificating process."* (p. 3276.) (Emphasis added.)

Under "Franchising" the Commission said:

"178. *Franchising. We are requiring that before a cable system commences operation with broadcast signals, it must obtain a certificate of compliance from the Commission. The application for such a certificate must contain (§ 76.31 [a] [1]) a copy of the franchise and a detailed statement showing that the franchising authority has considered in a public proceeding the system operator's legal, character, financial, technical, and other qualifications, and the adequacy and feasibility of construction arrangements.* We expect that franchising authorities will publicly invite applications, that all applications will be placed on public file, that notice of such filings will be given, that where appropriate a public hearing will be held to afford all interested persons an opportunity to testify on the qualifications of the applicants, and that the franchising authority will issue a public report setting forth the basis for its action. Such public participation in the franchising process is necessary to assure that the needs and desires of all segments of the community are carefully considered." (p. 3276.) (Emphasis added.)

The report covers among other things applicant qualifications, franchise area, construction, franchise duration, subscriber rates, service complaints, franchise fee, and grandfathering. Its conclusions were set forth in paragraph VI in part as follows:

"189. *Cable television is an emerging technology that promises a communications revolution. Inevitably, our regulatory pattern must evolve as cable evolves*—and no one can say what the precise dimensions will be. This report and order represents the amount and the substance of regulation that we believe is essential, at this stage, for the orderly development of the industry. We have taken long overdue first steps after more than 3 years of exhaustive inquiry.

"190. The rules will be effective March 31, 1972. Out of an abundance of caution, we are delaying the date beyond the 30 days ordinarily required so that we may have before us any petitions for reconsideration prior to the rules becoming operative. But for more than 3 years we have been gathering data, soliciting views, hearing argument, evaluating studies, examining alternatives, authorizing experiments—turning finally to public panel discussions unique in communications rule making—and, in this effort, have necessarily postponed the substantial public benefits that cable promises. In these circumstances, we do not foresee that there can be any case for further delay.

"191. *Authority for adoption of these rules is contained in sections 2, 3, 4 (i), and (j), 301, 303, 307, 308, and 309 of the Communications Act of 1934, as amended. We reaffirm our view that cable systems are neither broadcasters nor common carriers within the meaning of the Communication Act. Rather, cable is a hybrid that requires identification and regulation as a separate force in communications.*" (p. 3277.) (Emphasis added.)

Accordingly, the Federal Communications Commission, effective March 31, 1972, ordered its rules and regulations amended.

Under Subpart B—Applications and Certificates of Compliance, the rules and regulations provide (§ 76.11 [a]) that *no cable television system shall commence operations or add a television broadcast signal to existing operations unless it receives a certificate of compliance from the Commission.* In subparagraph (b) it provides that no cable television system lawfully carrying television broadcast signals in a community prior to March 31, 1972, shall continue carriage of such signals beyond the end of its current franchise period, or March 31, 1977, whichever occurs first, unless it receives a certificate of compliance.

Under Subpart C—Federal-State/Local Regulatory Relationships, Section 76.31 sets forth franchise standards under (a), similar to those enumerated in the summary of the ordinance here under consideration. Under subparagraph (b) it provides:

"(b) The franchise fee shall be reasonable (e. g., in the range of 3-5 percent of the franchisee's gross subscriber revenues per year from cable television operations in the community [including all forms of consideration, such as initial lump sum payments]). *If the franchise fee exceeds 3 percent of such revenues, the cable television system shall not receive Commission certification until the reasonableness of the fee is approved by the Commission on showings, by the franchisee, that it will not interfere with the effectuation of Federal regulatory goals in the field of cable television, and, by the franchising authority, that it is appropriate in light of the planned local regulatory program. The provisions of this paragraph shall not be effective with respect to a cable television system that was in operation prior to March 31, 1972, until the end of its current franchise period, or March 31, 1977, whichever occurs first.*" (p. 3281.) (Emphasis added.)

164

If the annual charge to a subscriber for CATV service is $60, as indicated in the report of the FCC's inquiry, the twenty cents per month set up in the Topeka ordinance per subscriber as the basis for an annual fee would amount to four percent of the gross revenue of the franchisee. The record is insufficient to go beyond this observation, but if the ordinance fails to comply with requirements of the FCC this would be changed by FCC regulation.

We now turn to the ordinance adopted by the City of Topeka purporting to grant a franchise to Cablecom-General of Topeka to construct, operate and maintain a community antenna television system within the City of Topeka, Kansas (ordinance No. 12986).

The trial court issued both a temporary and a permanent injunction to halt publication of the franchising ordinance until the litigation was finally determined.

One of the provisions in ordinance No. 12959, the enabling ordinance, provides:

"(12) The applicant may submit any information they deem appropriate whether required herein or not."

Cablecom-General of Topeka, to whom the franchise was granted, under the foregoing provision in its application made a generous offer of fringe benefits to the City. "Fringe benefits" is a term used by Lauren Nash, one of the City Commissioners of Topeka, in his deposition testimony taken during discovery which was before the trial court. Mr. Nash indicated in awarding a franchise he took into consideration the financial ability of the applicant to perform, how much experience the company had, "these all were taken into consideration besides the fringe benefits, as you might put it."

Nash testified concerning the lack of qualifications of the appellee, Capitol Cable, Inc. In response to a question he stated:

"They didn't have the financial backing, to start with. They didn't have the experience behind them, secondly. *They didn't give the fringe benefits, thirdly.* What else do you want to know?" (Emphasis added.)

Under section 6 of ordinance No. 12986 the City accepted the offer of Cablecom-General of Topeka as follows:

"*Section 6.* Benefits to Community: Pursuant to Section 10 of grantee's application, grantee has offered to furnish various services, merchandise and equipment which the City agrees to accept. It is agreed that said services, merchandise and equipment shall be available to the respective recipients within twenty-four (24) months from the effective date of this ordinance. It is understood that through negotiation and compromise and because of the

time of construction, certain alterations in equipment and other matters may be agreed upon by the grantee and the various recipients. Therefore, it is not the intent of this ordinance to prevent further negotiation to modify the guarantees made by the grantor so long as they are requested by the recipient.

"Grantee has offered and the City accepts grantee's proposal to pay to Washburn University in connection with KTWU Television Station annually *an amount equal to two (2) percent of its gross revenues. Grantee shall begin said payments annually, beginning one year from the effective date of this ordinance.*

"Grantee agrees to pay the sum of *Fifty Thousand ($50,000.00) Dollars upon the effective date of this ordinance as advance payment of the amounts to become due hereunder to Washburn University.* Grantee shall be credited annually against the advance payments for the amounts due hereunder. Grantee agrees to notify the City of all payments and credits hereunder." (Emphasis added.)

When the cost to Cablecom-General of Topeka of these additional benefits to the community are added to the annual fee which it is required to make to the City under the enabling ordinance, the total fee exacted by the City for administering the CATV system by the City governing body is far beyond what is reasonably necessary for regulatory purposes.

A study of all nine applications for a franchise made to the City governing body, readily discloses that the franchise was awarded to the highest bidder. Other applicants made similar bids, but considerably less in total benefits inuring either directly or indirectly to the City. One of the major reasons for holding the enabling ordinance of the City of Wichita void (*Community Antenna TV of Wichita, Inc. v. City of Wichita,* supra) was that the charges made by the City for the franchise were excessive and bore no reasonable relationship to the expense and inconvenience to be occasioned by the City. Washburn University is a municipal university deriving the majority of its support from the taxpayers of the City of Topeka. Any financial benefit received by Washburn University as a result of the issuance of the franchise to Cablecom-General of Topeka would inure indirectly to the City and be over and above the annual fee required by the enabling ordinance.

The annual franchise fee exacted by a city for the issuance of license or franchise must be reasonable and commensurate with the expense encountered to administer the public aspect of the business licensed or receiving the franchise. The control of annual franchise fees to assure their reasonableness is assumed by the Federal Communications Commission in its regulations.

Accordingly, ordinance No. 12986, whereby the City of Topeka attempts to grant a franchise to Cablecom-General of Topeka, is permeated with arbitrary and unreasonable action on the part of the governing body of the City of Topeka and must be set aside as void. (*Community Antenna TV of Wichita, Inc. v. City of Wichita,* supra.) The franchising ordinance of the governing body of the City fails to comply with the enabling ordinance.

Other points asserted on appeal are either moot or immaterial in view of our disposition of the case.

The judgment of the lower court declaring ordinance No. 12959 of the City of Topeka void is reversed, but as to ordinance No. 12986, granting a franchise to Cablecom-General of Topeka, the judgment voiding the franchise is affirmed.